UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| WENDIE FINNAN, <br><br> Plaintiff, <br><br> v. <br><br> ZURICH AMERICAN INSURANCE COMPANY, A NEW YORK CORPORATION, et al., <br><br> Defendants. | Case No. 19-cv-00331-LB <br><br> **ORDER GRANTING PLAINTIFF'S MOTION TO REMAND AND DENYING AS MOOT DEFENDANTS' MOTION TO DISMISS** <br><br> Re: ECF Nos. 5, 10 |

## INTRODUCTION

This is an employment dispute between plaintiff Wendie Finnan and her former employer Zurich American Insurance Company ("Zurich") and a Zurich supervisory manager, Rory Angold. Ms. Finnan alleges that the defendants induced her to move with her disabled husband from Florida to California to start a job with Zurich paying $180,000 a year. Once she started at Zurich, however, it turned out to be impossible for her to earn $180,000 a year because Zurich was not interested in the clients that she brought in. Ms. Finnan also alleges that before she was hired, Mr. Angold commented that she looked like an old schoolteacher and that he wanted to hire someone young and attractive to have "T&A" in the territory as opposed to someone like Ms. Finnan (who is over fifty). After Ms. Finnan was hired, Mr. Angold supported younger male employees but did not support her. Six months after Ms. Finnan started with Zurich, Zurich reduced its workforce

ORDER – No. 19-cv-00331-LB

and eliminated Ms. Finnan's position. Ms. Finnan alleges that Mr. Angold played a role in her termination and that he did so based on her age, gender, and appearance.

Ms. Finnan filed suit in California Superior Court, bringing claims (1) against Zurich and Mr. Angold for violation of California Labor Code §§ 970–977, (2) against Zurich for violation of California Government Code §§ 12940 et seq. for wrongful termination based on gender and age discrimination, (3) against Zurich and Mr. Angold for wrongful termination in violation of public policy, (4) against Zurich and Mr. Angold for intentional infliction of emotional distress, (5) against Zurich and Mr. Angold for fraud, (6) against Zurich and Mr. Angold for violation of California Business and Professions Code § 17200 et seq. for unfair business practices, (7) against Zurich and Mr. Angold for promissory estoppel, and (8) against Zurich and Mr. Angold for fraudulent concealment.

The defendants removed the case to federal court, claiming diversity jurisdiction because Ms. Finnan is a citizen of California and Zurich is a citizen of New York and Illinois. Mr. Angold is also a citizen of California — but the defendants argue that Mr. Angold was fraudulently joined to this case and his citizenship thus should be disregarded. Ms. Finnan moved to remand the case back to state court. The defendants moved to dismiss Ms. Finnan's complaint.[1]

The court can decide the motions without oral argument. N.D. Cal. Civ. L.R. 7-1(b). The court grants Ms. Finnan's motion to remand and denies the defendants' motion to dismiss without prejudice as moot.

---

[1] The defendants also moved for leave to file a sur-reply to Ms. Finnan's reply to the defendants' opposition to Ms. Finnan's motion to remand. The court grants the defendants' motion and considered the sur-reply in deciding the underlying motion to remand.

ORDER – No. 19-cv-00331-LB  2

# STATEMENT

## 1. The Parties' Citizenship

Ms. Finnan and Mr. Angold are both citizens of California.[2] Zurich is a citizen of New York and Illinois and is not a citizen of California.[3]

## 2. The Complaint

Ms. Finnan makes the following allegations in her complaint.

In 2017, Ms. Finnan was living in Florida with her disabled husband.[4] In April 2017, she received a telephone call from a Zurich employee soliciting her for an account-executive position with Zurich in Northern California under the supervision of Pamela Frades, the Regional Sales Manager.[5] Ms. Finnan then spoke with Ms. Frades on that call.[6] Ms. Frades said that the position involved selling commercial- and personal-insurance products and property and casualty coverage to car dealers.[7] Ms. Frades said that Zurich had been in business for over a hundred years and was a $650-billion-dollar insurance company that was very stable, that Zurich insured over half the car dealerships in the United States, and that Zurich provided premium products that were the best in the industry.[8] (Ms. Finnan alleges that, contrary to Ms. Frades's statements, Zurich's sales of property and casualty coverage had been decreasing and Zurich planned to undergo a round of layoffs of property- and casualty-coverage salespeople.[9])

---

[2] Compl. – ECF No. 1 at 23–24 (¶¶ 4, 7). Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[3] Liberman Decl. – ECF No. 1-2 at 2 (¶ 3).

[4] Compl. – ECF No. 1 at 25 (¶ 12).

[5] *Id.*

[6] *Id.*

[7] *Id.* (¶ 13).

[8] *Id.* at 25–26 (¶ 13).

[9] *Id.* (¶ 14).

Ms. Frades said that Zurich was looking to hire long-term career candidates and was not interested in applicants looking just for a job or a short-term position.[10] Ms. Frades said that there were three account-executive positions for three territories that were available and that they paid $100,000, $120,000 and $180,000 per year, respectively.[11] Ms. Finnan responded that she would be interested only in the $180,000 position, because she was happy at her current job, moving to California would be a major life change for her and her disabled husband, and she would consider making a significant life change only for a long-term stable career with exceptional income potential.[12]

In May 2017, Ms. Finnan flew to California for an in-person interview with Ms. Frades.[13] In June 2017, Ms. Finnan flew to California for several days to have another in-person interview, view her potential territory, and gain insight into the position.[14] Ms. Finnan met with Ms. Frades and two other Zurich management employees, Rory Angold and Josh Danielson, on that trip.[15] Prior to Ms. Finnan's flying out, Mr. Angold looked up her LinkedIn profile and said that she looked like an old schoolteacher.[16] Mr. Angold said he wanted to hire someone young and attractive and wanted "T&A" (tits and ass) in the territory, not someone like Ms. Finnan.[17]

At the June 2017 meeting, Mr. Angold asked Ms. Finnan if she knew what the position paid.[18] Ms. Finnan said that she understood it was to pay around $180,000.[19] Mr. Angold said that was correct, Ms. Frades nodded affirmatively, and Mr. Danielson did not dispute that amount.[20]

---

[10] *Id.* at 26 (¶ 13).
[11] *Id.* (¶ 15).
[12] *Id.* (¶ 16).
[13] *Id.* (¶ 19).
[14] *Id.* at 27 (¶ 20).
[15] *Id.* (¶ 21).
[16] *Id.* (¶ 20).
[17] *Id.*
[18] *Id.* (¶ 22).
[19] *Id.*
[20] *Id.*

On July 5, 2017, Ms. Finnan received an employment offer letter from Zurich.[21] The letter said that Ms. Finnan would be working remotely from her home office and reporting to Ms. Frades, with an anticipated start date of July 24, 2017.[22] Ms. Frades allowed Ms. Finnan a week in Florida after the July 24 start date to prepare for the move to California.[23] Ms. Frades was aware that Ms. Finnan's husband had just undergone surgery, was under home health care, was unable to walk, and was on an intravenous line for antibiotics.[24] Based on the information Zurich provided to her, Ms. Finnan packed up or sold her belongings and moved to California, where she began her employment with Zurich, approximately one week after the July 24 start date.[25]

Within a couple of weeks of Ms. Finnan's starting at Zurich, her manager (Ms. Frades) was transferred and was never replaced.[26]

Mr. Angold supported the younger male employees and spent time with them in their territories but refused to spend time with Ms. Finnan in her territory, allegedly because of her gender, age, and appearance.[27]

It turned out to be impossible for Ms. Finnan to earn $180,000 a year because Zurich was not interested in the types of clients that Ms. Finnan was hired and incentivized by commissions to solicit and retain.[28] Within six months of Ms. Finnan's starting with Zurich, Zurich reduced its presence in this line of business, reduced its workforce, and eliminated Ms. Finnan's position.[29] Ms. Finnan alleges on information and belief that Mr. Angold played a role in Zurich's decision to terminate her due to her age, gender, and appearance.[30]

---

[21] *Id.* (¶ 24).
[22] *Id.*
[23] *Id.* (¶ 25).
[24] *Id.*
[25] *Id.* at 27–28 (¶ 26).
[26] *Id.* at 28 (¶ 27).
[27] *Id.*
[28] *Id.* (¶ 28).
[29] *Id.*
[30] *Id.* (¶ 29).

### 3. Ms. Frades's Declaration

Ms. Finnan attaches to her motion to remand a sworn declaration from Ms. Frades that contains additional assertions.

Ms. Finnan submitted an application to Zurich in April 2017 and completed an online assessment.[31] Ms. Finnan scored 34, significantly higher than all other candidates, who had scores that ranged from 19 to 27.[32] In May 2017, Ms. Frades and Divisional Vice President Josh Danielson reviewed the candidates' applications and agreed that Ms. Finnan was the top candidate based on her qualifications.[33] When Ms. Finnan came in for her first in-person interview in May, Mr. Danielson's attitude changed.[34] Mr. Danielson asked Ms. Frades, "Do you see her?" (referring to Ms. Finnan) and repeated several times that Ms. Frades needed to look at Ms. Finnan.[35] Ms. Frades believes Mr. Danielson was attempting to indicate that he had an issue with Ms. Finnan's age and appearance.[36] Mr. Danielson was scheduled to attend Ms. Finnan's interview with Ms. Frades, but after seeing her, asked to be excused from the interview.[37]

Ms. Frades conducted an interview of Ms. Finnan alone and said that the interview went extremely well.[38] Ms. Frades said that the next step in the candidacy process was for Ms. Finnan to do a ride-along with another account executive in her proposed territory.[39] Ms. Frades said that she would arrange the ride-along quickly because the account executive was leaving Zurich at the end of the month, and it was important for that account executive to pass her knowledge to Ms. Finnan.[40]

---

[31] Frades Decl. – ECF No. 10-1 at 3 (¶ 5).
[32] *Id.*
[33] *Id.* (¶ 6).
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.* (¶ 7).
[38] *Id.* at 3–4 (¶ 8).
[39] *Id.* at 4 (¶ 9).
[40] *Id.*

Ms. Frades was unable to secure a second interview with Ms. Finnan for six weeks.[41] Ms. Frades states that her co-manager, Rory Angold, adamantly opposed hiring her due to her gender, age, and appearance.[42] Mr. Angold looked up Ms. Finnan's LinkedIn profile and said that she looked like an old schoolteacher.[43] Mr. Angold said that if a female were to be hired at all, he only wanted to hire someone young and attractive.[44] Mr. Angold said he wanted "T&A" (tits and ass) in the territory, "not someone like Wendie [Finnan]."[45] Mr. Angold said he would rather hire another individual who Ms. Frades characterized as a "young attractive female candidate."[46]

In May 2017, Mr. Danielson and Mr. Angold conducted phone interviews with Ms. Finnan.[47] Mr. Angold told Ms. Frades that the interview went well but that he was still against hiring Ms. Finnan, repeating that she was "old" and "like a schoolteacher."[48] Mr. Angold said Ms. Finnan belonged in a cubicle, not out in the field to be rejected by dealers when they see her.[49] Mr. Angold repeated that he wanted some "T&A" in the territory and wanted someone young and attractive "like [the other female candidate]."[50]

In June 2017, Ms. Finnan had a second interview with Ms. Frades, Mr. Angold, and Mr. Danielson.[51] Mr. Angold asked Ms. Finnan if she knew what the position paid.[52] Ms. Finnan said around $180,000, and Mr. Angold said that was correct.[53] Ms. Frades characterizes Ms. Finnan's

---

[41] *Id.* (¶ 10).
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] *Id.* (¶ 11).
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.* at 5 (¶ 13).
[52] *Id.* (¶ 14).
[53] *Id.*

second interview as going exceptionally well and states that she, Mr. Angold, and Mr. Danielson all agreed that they should have it recorded to show candidates how to interview.[54]

Ms. Finnan reported for work in California at Zurich on August 1, 2017.[55] In mid-August, Ms. Frades accepted a position with Zurich in Seattle and told Ms. Finnan that she would no longer be Ms. Finnan's manager.[56] Mr. Angold and Mr. Danielson became Ms. Finnan's acting managers.[57]

Mr. Angold reported to Ms. Frades that Ms. Finnan was troublesome because she called underwriters, peers, instructors, and others to ask questions.[58] Ms. Frades asked Mr. Angold why he was not doing his job as a manager to support Ms. Finnan's professional development.[59] Mr. Angold responded that he did not like Ms. Finnan.[60]

Mr. Angold supported male account executives and spent time with them in their territories but refused to spend time with Ms. Finnan in hers.[61] Mr. Angold also excluded Ms. Finnan from discussions and correspondence regarding clients and potential clients.[62] For example, Mr. Angold had a meeting with a "mega" dealer group to try to get their finance and insurance business.[63] Mr. Angold told Ms. Frades that he had not told Ms. Finnan that Zurich was working with the group because Ms. Finnan did not fit the image of the Zurich brand that he wanted to convey.[64] Mr. Angold referred to Ms. Finnan as "fat and ugly."[65]

---

[54] *Id.* (¶ 16).
[55] *Id.* at 6 (¶ 21).
[56] *Id.* (¶ 23).
[57] *Id.*
[58] *Id.* (¶ 24).
[59] *Id.*
[60] *Id.*
[61] *Id.* at 7 (¶ 26).
[62] *Id.*
[63] *Id.* (¶ 27).
[64] *Id.*
[65] *Id.* (¶ 28.b).

In December 2017 or January 2018, Zurich instituted a round of layoffs.[66] Ms. Frades believes that female field staff, especially over 50 years in age, were terminated at a higher rate than men.[67] Ms. Frades believes that Mr. Angold discussed with Jeffrey Bahr, Divisional Vice President, who would be terminated in the layoffs and that Mr. Angold was instrumental in determining who would be terminated.[68]

**ANALYSIS**

The parties filed competing motions: Ms. Finnan's motion to remand and defendants' motion to dismiss. The court first considers Ms. Finnan's motion because it goes to federal subject-matter jurisdiction, a threshold inquiry.

**1. Governing Law**

Subject to certain limitations, a defendant in state court may remove an action to federal court if the case could have been filed originally in federal court. 28 U.S.C. § 1441(a). Original jurisdiction may be based on diversity or federal-question jurisdiction. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987); 28 U.S.C. §§ 1331, 1332. To invoke diversity jurisdiction, the complaint must allege that "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between [] citizens of different States[.]" 28 U.S.C. § 1332(a)(1).

"Diversity removal requires complete diversity, meaning that each plaintiff must be of a different citizenship from each defendant." *Grancare, LLC v. Thrower ex rel. Mills*, 889 F.3d 543, 548 (9th Cir. 2018) (citing *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996)). "In determining whether there is complete diversity, district courts may disregard the citizenship of a non-diverse defendant who has been fraudulently joined." *Id.* (citing *Chesapeake & Ohio Ry. Co. v. Cockrell*,

---

[66] *Id.* at 8 (¶ 30).
[67] *Id.*
[68] *Id.* (¶ 31).

ORDER – No. 19-cv-00331-LB 9

232 U.S. 146, 152 (1914)). "There are two ways to establish fraudulent joinder: '(1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court.'" *Id.* (quoting *Hunter v. Philip Morris USA*, 582 F.3d 1039, 1044 (9th Cir. 2009)). "Fraudulent joinder is established the second way if a defendant shows that an 'individual joined in the action cannot be liable on any theory.'" *Id.* (internal brackets omitted) (quoting *Ritchey v. Upjohn Drug Co.*, 139 F.3d 1313, 1318 (9th Cir. 1998)). "But 'if there is a *possibility* that a state court would find that the complaint states a cause of action against any of the resident defendants, the federal court must find that the joinder was proper and remand the case to the state court.'" *Id.* (emphasis in original) (quoting *Hunter*, 582 F.3d at 1046)).

"A defendant invoking federal court diversity jurisdiction on the basis of fraudulent joinder bears a 'heavy burden' since there is a 'general presumption against finding fraudulent joinder.'" *Id.* (internal brackets omitted) (quoting *Hunter*, 582 F.3d at 1046)). "Fraudulent joinder must be proven by clear and convincing evidence." *Hamilton Materials Inc. v. Dow Chem. Corp.*, 494 F.3d 1203, 1206 (9th Cir. 2007) (citing *Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 461 (2d Cir. 1998)). Courts refuse to find fraudulent joiner "where a defendant raises a defense that requires a searching inquiry into the merits of the plaintiff's case, even if that defense, if successful, would prove fatal." *Grancare*, 889 F.3d at 548–49 (citing *Hunter*, 582 F.3d at 1046). Additionally, "[i]f a defendant cannot withstand a Rule 12(b)(6) motion, the fraudulent inquiry does not end there. For example, the district court must consider . . . whether a deficiency in the complaint can possibly be cured by granting the plaintiff leave to amend." *Id.* at 550. A court may find fraudulent joinder only if the claim against the non-diverse defendant is "wholly insubstantial and frivolous." *Id.* at 549.[69]

---

[69] The defendants argue that in deciding whether a defendant has been fraudulently joined, the defendants can present facts outside the complaint, while the plaintiff is limited to the facts and allegations asserted in her complaint and cannot rely on unpleaded facts or allegations. Defs. Remand Opp'n – ECF No. 17 at 8–9. In support of their argument, the defendants cite *Kruso v. International Telephone & Telegraph Corp.*, 872 F.2d 1416, 1426 n.12 (9th Cir. 1989). *Kruso* does not support the defendants' argument. The Ninth Circuit in *Kruso* "emphasized the fact that the plaintiffs had not only failed to state a claim against the defendants, but also *could not* have stated a claim under the

## 2. Application

The defendants here have not met their "heavy burden" to show that Mr. Angold "cannot be liable on any theory" and that Ms. Finnan's claim against him is "wholly insubstantial and frivolous." *Cf. Grancare*, 889 F.3d at 548–50. For example, Ms. Finnan pleads (among other claims) a claim for intentional infliction of emotional distress ("IIED") against Mr. Angold. Ms. Finnan's complaint and Ms. Frades's declaration (which Ms. Finnan could amend her complaint to include, and thus which the court must consider, *Grancare*, 889 F.3d at 550) allege that Mr. Angold opposed hiring Ms. Finnan because of her age, gender, and appearance, instead wanted to hire "T&A" for her position, and after Zurich hired her, discriminated against her and excluded her from opportunities offered to other employees — and ultimately terminated her — based on her age, gender, and appearance. This may potentially plead an IIED claim. *Cf., e.g.*, *De Ruiz v. Courtyard Mgmt. Corp.*, No. C 06-03198 WHA, 2006 WL 2053505, at *4 (N.D. Cal. July 21, 2006) ("'Behavior may be considered outrageous, and sufficient to sustain an IIED claim, if a defendant abuses a relation or position which gives him power to damage the plaintiff's interest.'") (internal brackets omitted) (quoting *Agarwal v. Johnson*, 25 Cal. 3d 932, 946 (1979)); *Gibson v. Am. Airlines*, No. C 96-1444 FMS, 1996 WL 329632, at *4 (N.D. Cal. June 6, 1996) (allegations that defendants "at all times intended to terminate plaintiff and not allow her to advance" and denied plaintiff rights that were given to other employees could plead an IIED claim).

Because the defendants have not shown that Mr. Angold was fraudulently joined and because there is no diversity of citizenship between Ms. Finnan and Mr. Angold, remand is appropriate.[70]

---

circumstances of that case." *Umamoto v. Insphere Ins. Sols., Inc.*, No. 13-CV-0475-LHK, 2013 WL 2084475, at *7 (N.D. Cal. May 14, 2013) (emphasis in original) (citing *Kruso*, 872 F.2d at 1427). "*Kruso* thus reaffirmed the overarching principle that, absent some special circumstances, only a categorical defect in the plaintiff's claims would support a finding of fraudulent joinder." *Tang v. Rosenwald*, No. CV-16-01317-MWF-PLA, 2016 WL 1715183, at *4 (C.D. Cal. Apr. 27, 2016). The defendants' argument is squarely foreclosed by *Grancare*, in which the Ninth Circuit held that courts must consider whether a plaintiff could amend her complaint to plead a claim against a non-diverse defendant in determining whether that defendant was fraudulently joined. *Grancare*, 889 F.3d at 550.

[70] Ms. Finnan also requests her attorney's fees and costs in moving to remand. Pl. Remand Mot. – ECF No. 10 at 2. A defendant who removes a case improperly may be sanctioned under Rule 11 and 28 U.S.C. § 1447. In particular, Section 1447(c) provides that "[a]n order remanding the case may require

## CONCLUSION

The court grants Ms. Finnan's motion and remands the case to the Superior Court for the County of Marin. The court denies defendants' motion to dismiss as moot, without prejudice to any motion the defendants might bring before the state court.

**IT IS SO ORDERED.**

Dated: March 18, 2019

LAUREL BEELER
United States Magistrate Judge

---

payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." Awarding fees in this situation is discretionary, and they may be awarded only if such an award is "just." *See Martin v. Franklin Capital Corp.*, 546 U.S. 132, 136, 138 (2005). "Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal." *Id.* at 141. Thus, "when an objectively reasonable basis exists, fees should be denied." *Id.* "A district court has broad discretion under this provision." *Calero v. Unisys Corp.*, 271 F. Supp. 2d 1172, 1182 (N.D. Cal. 2003) (citing *Moore v. Permanente Med. Grp., Inc.*, 981 F.2d 443, 447 (9th Cir. 1992)). The court in its discretion declines to award costs or fees here.

ORDER – No. 19-cv-00331-LB    12